IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 08-CV-00358-WDM-BNB

DMA INTERNATIONAL, INC,

    Petitioner,

v.

QWEST COMMUNICATIONS INTERNATIONAL, *et al.*,

    Respondents.

## ORDER ON MOTIONS TO VACATE AND TO CONFIRM

Miller, J.

This matter is before me on Petitioner DMA International, Inc.'s ("DMA") Motion to Vacate Arbitration Award (Docket No. 1) and Respondent Qwest Communications International's[1] ("Qwest") Motion to Confirm Arbitration Award (Docket No. 13). After a review of the pleadings and the parties' written arguments, I conclude oral argument is not required. For the reasons that follow, DMA's Motion to Vacate (Docket No. 1) shall be denied and Qwest's Motion to Confirm (Docket No. 13) shall be granted.

Background

In May 2004, DMA entered into a written contract, the Professional Services Agreement ("PSA"), with Qwest to provide consulting services in the form of research-

---

[1] Respondents are Qwest and its affiliated entities. I shall collectively refer to all Respondents as "Qwest."

related work on circuits within Qwest's telecommunications system. The Statement of Work ("SOW"), an exhibit to the PSA,[2] defined the scope of the services DMA was to provide to Qwest. The SOW also included Section 4.1, relating to payment for services:

> 4. **Service Fees**. During the term of this Statement of Work, fees for Services rendered hereunder are as follows:
>    4.1. For satisfactory completion and delivery of the Services, Supplier[3] shall invoice monthly as follows:
>    Twenty-five dollars and twenty cents ($25.20) per circuit satisfactorily completed. (Fee is based on an hourly rate of forty-five dollars ($45) with 1.8 circuits completed per hour.)

Notably, although the SOW defined "Services", it did not provide a definition for "satisfactory completion" of Services. The parties also represent that most of the negotiations for the contract price surrounded the $45 per hour rate rather than the $25.20 per circuit satisfactorily completed rate. Approximately one week before the Contract was executed, Qwest added the $25.20 per circuit satisfactorily completed language to the Contract. Qwest contends that this was done to ensure that DMA successfully completed a specific number of circuits in exchange for the budgeted $1.76 million total contract price.

Over the eight month course of the contract, DMA billed Qwest eight times pursuant to Section 5 of the PSA which provided:

> 5. **Invoices and Payments:**
>    5.1 For Services performed on a time and materials basis Supplier will charge the rates set forth in Exhibit B hereto[, the SOW,] and will invoice Qwest on a monthly basis.

---

[2] At times throughout this Order I will refer to the PSA and SOW collectively as "the Contract."

[3] DMA is the "Supplier" in the PSA.

> 5.2. For Services performed at a fixed price Supplier will invoice Qwest upon completion an acceptance of milestones in accordance with the payment schedule set forth in the appropriate Order.
> 5.3 Within thirty (30) days after providing Services to Qwest, Supplier will issue an invoice therefore by the method agreed upon by the parties. . . .
> 5.4 Qwest will pay in U.S. dollars the amounts set forth in any undisputed invoice within forty-five (45) days following receipt of such invoice. Payment by Qwest will not constitute acceptance of the applicable Services.
> 5.5 Qwest will notify Supplier of any dispute with respect to an invoice in writing. . . .

Qwest paid these eight invoices, which totaled $1,765,172.25. Despite the invoice totals, DMA maintains that it was completing more work than that reflected in the invoices. DMA maintains that Qwest instructed it to bill only up to Qwest's unwritten budget expectations, rather than the full amount of work that DMA was completing each month. DMA complied with this instruction with the understanding that any variance would be dealt with at a later date. DMA further alleges that Qwest assigned greater numbers of circuits to DMA in the later months of the contract.

The PSA also provided a method by which Qwest would accept or reject the Services provided by DMA (Section 8):

> 8. **Acceptance:**
> If Qwest is not satisfied with any Service, Qwest will so notify Supplier within thirty (30) days after Supplier's performance of such Service. Supplier will, at its own expense, re-perform the Service within fifteen (15) days after receipt of Qwest's notice of deficiency. The foregoing procedure will be repeated until Qwest accepts or finally rejects the Service in its sole discretion. In the event that Qwest finally rejects any Service, Supplier will refund to Qwest all fees paid by Qwest with respect to the Service.

Qwest did not reject any Services provided by DMA that were billed in the eight invoices.

Finally, the PSA included an arbitration provision ("Arbitration Clause") which

stated that ""[a]ny dispute arising out of or relating to this Agreement, including the breach, termination or validity hereof, that has not been resolved by negotiation as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by arbitration pursuant to the Federal Arbitration Act." The Arbitration Clause further provided that "[t]he arbitrator's decision shall follow the plain meaning of the Agreement and shall be final, binding, and enforceable in a court of competent jurisdiction."

In December 2004, despite months of contract renewal negotiations, Qwest decided not to renew the Contract with DMA. Several days later Qwest also terminated the services of Kevin Labuhn, DMA's only on-site manager at Qwest. DMA contends that this termination blocked DMA's access to the records of the number of circuits that DMA completed. Therefore, it took DMA more than two months[4] to put together Invoice T-0009, which DMA alleges represents the number of initially verifiable unpaid circuits that DMA completed during the course of the contract. The total for this invoice was $5,398,658.55. DMA further alleges that there are additional unpaid circuits that have not been invoiced, bringing the total additional payment that DMA seeks to approximately $12.7 million. Apparently, only $5,398,658.55 of the $12.7 million has been billed to Qwest—in Invoice T-0009—and the remaining approximately $7.3 million is not reflected in an invoice but was asserted as an additional amount owed during the

---

[4] Invoice T-0009 is dated March 10, 2005. It is undisputed that the invoice was submitted more than thirty days after the services were rendered, as required by the PSA. It is also undisputed that Invoice T-0009 was not submitted to Josh Arnold, Qwest's Strategic Sourcing Manager, as required by the SOW.

arbitration proceedings. It is undisputed that Qwest did not give formal written notice to DMA that it disputed Invoice T-0009 until October 12, 2005.[5] However, the parties met to discuss the invoice on June 28, 2005.

Thereafter, pursuant to the PSA's arbitration clause, DMA initiated arbitration proceedings seeking $12.7 million in additional compensation for work it claimed to have completed during the course of the contract but was not paid for and asserting tort claims against Qwest. The first arbitrator chosen, Michael A. Williams, had to resign prior to rendering a decision due to medical issues. Prior to his resignation, however, he denied DMA's Motion for Partial Summary Judgment in which DMA argued that Section 4.1 of the PSA unambiguously obligated Qwest to pay $25.20 for each circuit DMA claimed to have researched. Williams determined that the Section 4.1 was ambiguous and extrinsic evidence was required to determine the parties' intent.

A replacement arbitrator, Judge James S. Miller (the "Arbitrator"), was chosen pursuant to the procedure specified in the PSA. After his selection, the Arbitrator denied DMA's motion in limine which again asserted that the PSA was unambiguous and DMA was owed $25.20 per circuit for the unpaid circuits completed. In September 2007, the Arbitrator conducted an eleven-day hearing during which sixteen witnesses testified and 140 exhibits were received into evidence. In a written opinion issued

---

[5] DMA contends that Qwest was required to give notice that it disputed the invoice within forty-five days of receiving the invoice. (*See* Reply, Docket No. 20 at 29.) I note, however, that although the PSA requires payment of any undisputed invoice within forty-five days, it does not require notice of dispute be sent within forty-five days. Rather, the PSA requires that "Qwest will notify Supplier of any dispute with respect to an invoice in writing."

November, 21, 2007 (the "Award"), the Arbitrator determined that Section 4.1 was ambiguous and turned to extrinsic evidence to determine what contract price the parties intended. Considering the parties' negotiations, the contract language, and the parties' actions in carrying out the contract, he concluded that the parties intended that the contract be based on a $45 per hour rate. Thus, he concluded that the contract had been paid in full and Qwest did not owe any additional compensation to DMA. The Arbitrator did not, however, expressly address DMA's argument that Qwest was required to pay Invoice T-0009 because Qwest did not formally dispute the invoice within forty-five days of receiving it. The Arbitrator also found that DMA's tort claims failed as a matter of law.

## Standard of Review

"Judicial review of arbitration panel decisions is extremely limited; indeed, it has been described as 'among the narrowest known to law.'" *Dominion Video Satellite, Inc. v. Echostar Satellite, L.L.C.*, 430 F.3d 1269, 1275 (10th Cir. 2005) (quoting *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001)). "'Once an arbitration award is entered, the finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances.'" *Hollern v. Wachovia Sec., Inc.*, 458 F.3d 1169, 1172 (10th Cir. 2006) (quoting *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1146–47 (10th Cir. 1982)). "A district court may vacate an arbitral award only for reasons enumerated in the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, or for a 'handful of judicially-

created reasons.'"[6]  *Id.* (quoting *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001)).  The FAA sets forth four reasons for vacating an arbitration award: "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evidence partiality or corruption in the arbitrators . . . ; (3) where the arbitrators were guilty of misconduct . . . by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made."  9 U.S.C. § 10(a).  The judicially-created grounds which DMA alleges are (1) that the Arbitrator acted in manifest disregard of the law, *see Hollern*, 458 F.3d at 1176 (citing *Dominion Video*, 430 F.3d at 1274) (discussing vacatur based on manifest disregard of the law), and (2) that the Award violated public policy, *see Denver & Rio Grande W. R.R. v. Union Pac. R.R.*, 119 F.3d 847, 849 (10th Cir. 1997) (noting that arbitration awards may be vacated for violation of public policy).

## Discussion

DMA seeks an order vacating the judgment of the Arbitrator on four grounds: (1) the Arbitrator's decision was made in manifest disregard of the law; (2) there was evident partiality or corruption on the part of the Arbitrator; (3) the Arbitrator's decision violates public policy; and (4) the Arbitrator exceeded his powers.  DMA also argues that the Arbitrator did not address DMA's claim for payment of Invoice T-0009 and, therefore, I should enter judgment for DMA with respect to this claim.  I will address

---

[6] Qwest's argument that judicially created reasons are no longer appropriate grounds for vacating an arbitration award under *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 128 S.Ct. 1396, 1403, 1405 (2008), is discussed *infra*.

each argument in turn.

1. Effect of <u>*Hall Street Assocs., LLC v. Mattel, Inc.*, 128 S.Ct. 1396 (2008)</u>

As a preliminary matter, I must address Qwest's argument that after the Supreme Court's *Hall Street* decision only the grounds enumerated in 9 U.S.C. § 10 are valid grounds for vacating an arbitration award, *i.e.*, judicially-created grounds are no longer valid. In *Hall Street* the parties to a lawsuit, with the consent of the district court, submitted to arbitration for one of the disputed claims. The arbitration agreement, which was entered as an order by the district court, stated that the district court "shall vacate, modify or correct any award: (i) where the arbitrator's findings of facts are not supported by substantial evidence, or (ii) where the arbitrator's conclusions of law are erroneous." *Id.* at 1400–01. This standard of review was in direct contrast to the FAA, which states that a district court shall confirm an arbitration award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11." 9 U.S.C. § 9. As noted above, Section 10 lists the four grounds on which an arbitration award may be vacated.

Based on the statutory text, the *Hall Street* Court determined that "§§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification." *Hall Street*, 128 S.Ct. at 1403–04. The Court explained that its own use of the term "manifest disregard of the law" in *Wilko v. Swan*, 346 U.S. 427 (1953), as a ground for vacating arbitration awards did not compel a different result. *See id.* at 1403–05. First, the Court noted the difference between a "supposed judicial expansion by interpretation", what *Wilko* seemingly created, and a "private expansion by contract", at issue in *Hall Street*. The Court also mused that "[m]aybe the term "manifest

disregard" was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them." *Id.* at 1404. The Court also offered that "'manifest disregard' may have been shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were 'guilty of misconduct' or 'exceeded their powers.'" *Id.* Finally, the Court expressly declined to read *Wilko* as authorizing additional, judicially-created grounds for vacatur. *See id.*

Although it may be that, in the wake of *Hall Street*, only the reasons enumerated in 9 U.S.C. § 10 are valid grounds for vacating an arbitration award, there remains some question as to whether *Hall Street* did indeed eliminate all *judicially-created* grounds for vacatur. First, I note that *Hall Street* expressly acknowledged that there was a difference between "judicial expansion by interpretation" and a "private expansion by contract", the issue in *Hall Street*. Second, *Hall Street* stated that it was determining "whether statutory grounds for prompt vacatur and modification may be *supplemented by contract*." *Hall Street*, 128 S.Ct. at 1400 (emphasis added). I also note that neither the Tenth Circuit nor any district court in the Tenth Circuit has addressed the impact of *Hall Street*. However, in this case I need not decide the difficult issue as DMA's claim for vacatur fails under the standards for the judicially-created grounds for vacatur set forth by DMA—manifest disregard of the law and violation of public policy.

2.  Manifest Disregard of the Law

DMA argues that the Arbitrator acted in manifest disregard of the law when he determined that Section 4.1 was ambiguous, looked to extrinsic evidence to determine the parties' intent, and concluded that the agreed upon rate of pay was $45 per hour.

Qwest responds that the Arbitrator expressly followed Colorado contract interpretation law when he determined the rate of pay for the contract and, therefore, did not manifestly disregard the law. I agree with Qwest.

Generally, a district court may not vacate an arbitration award based on an arbitrator's errors in "interpretation or application of the law." *Hollern*, 458 F.3d at 1176 (citing *Dominion Video*, 430 F.3d at 1274). "A judicially-created exception to this rule exists, however, where arbitrators act in manifest disregard of the law." *Id.* (citing *Dominion Video*, 430 F.3d at 1274). Manifest disregard of the law means "willful inattentiveness to the governing law." *Id.* (citing *Dominion Video*, 430 F.3d at 1274). Therefore, "[t]o warrant setting aside an arbitration award based on manifest disregard of the law, 'the record must show the arbitrators knew the law and explicitly disregarded it.'" *Id.* (quoting *Dominion Video*, 430 F.3d at 1274).

In this case, the Arbitrator stated and applied the correct law governing interpretation of contracts:

> Terms used in a contract are ambiguous where they are susceptible to more than one reasonable interpretation. *Ad Two, Inc. v. City and County of Denver*, 9 P.3d 373 (Colo. 2000). In determining whether the contract is ambiguous as to its payment provisions I must examine the plain language of the contract, and construe that language with its plain and generally accepted meaning and with reference to all of the provisions of the contract. *Radiology Professional Corp. v. Trinidad Area Health Association, Inc.*, 577 P.2d 748 (Colo. 1978). If the contact [sic] clearly expresses the intent of the parties it is not ambiguous and must be construed as written, *Thompson v. Sweet*, 17 P.2d 308 (Colo. 1932), and in determining whether an ambiguity exists I may look at the generally accepted meaning of words with reference to all contractual provisions and the nature of the transaction which forms the contact [sic] subject matter, *In re Marriage of Thompson*, 802 P.2d 1189 (Colo. App. 1990).

(Award at 2–3.) Applying that law, the Arbitrator determined that Section 4.1 was

ambiguous. That decision was not inappropriately based on extrinsic evidence as DMA alleges; rather, the Arbitrator first determined that the language in the SOW was ambiguous and then looked to extrinsic evidence to determine what rate of the pay the parties intended. *Id.* at 2–4. Clearly, DMA disagrees with the Arbitrator's conclusion that the contract was ambiguous in defining the rate of pay. Such disagreement, however, does not demonstrate that the Arbitrator acted with manifest disregard of the law or otherwise provide a ground on which I may vacate the Award.

DMA also argues that the Arbitrator erred when he concluded that "based upon the overwhelming preponderance of all of the evidence . . . the parties intended that DMA be paid at the rate of forty-five dollars per DMA consultant-hour", asserting that the evidence incontrovertibly supports only a conclusion that the parties intended the rate of pay to be $25.20 per circuit satisfactorily completed. *Id.* at 3. The Arbitrator based his final conclusion that the parties intended the rate of pay to be $45 per hour on the remainder of the Contract language, the testimony of David Moser, Rich Shawl, Charles Koenig and Josh Arnold, and the actions of the parties in carrying out the terms of the Contract. Although there is arguably some evidence tending to demonstrate that the parties intended that the rate of pay be $25.20 per circuit satisfactorily completed,[7] there is also evidence tending to demonstrate that the parties intended the rate of pay to be $45 per hour—*i.e.*, the evidence that the Arbitrator ultimately relied upon in making his

---

[7] In particular, DMA focuses on the testimony of Josh Arnold to support its argument that the extrinsic evidence undeniably demonstrated that the rate of pay was $25.20 per circuit satisfactorily completed. Even if I were to read Arnold's testimony in this manner, I cannot vacate the Award based on my own interpretation of the evidence contrary to the Arbitrator's.

determination. The Arbitrator's weighing of the evidence and final decision in this matter is entitled to great deference and may not be overturned simply because there was evidence supporting both outcomes. *See Hollern*, 458 F.3d at 1172 ("'Once an arbitration award is entered, the finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances.'"). Therefore, vacatur is not warranted on this argument.

Next, DMA argues that Qwest waived the argument that the rate of pay was $45 per hour and, therefore, the Arbitrator was precluded from using a $45 per hour rate. I disagree with DMA's reading of Qwest's representations. Although Qwest stated that it was "not saying . . . that this is a $45.00 an hour contract" it also tied the $25.20 per circuit rate to the $45 per hour rate—"We're saying that the obligation to pay 25.20 for each circuit satisfactorily completed, but the completion process here involves the research that we have been talking bout and that's a process, if it's fully done, is going to translate to approximately $45 an hour for the time of the contractors, and that is the amount that Qwest paid under the contract." (Arbitration Hearing Tr. at 1175.) I also note that Qwest asserted that the rate of pay was $45 per hour in its Response to DMA's motion for partial summary judgment. Therefore, I conclude that the statement by Qwest does not constitute a waiver of the argument nor warrant vacatur, especially considering the deferential standard of review that I must follow.

Finally, DMA argues that vacatur is warranted because the Arbitrator's decision was contrary to the express language of the contract. *See, e.g.*, *Int'l Union of Operating Eng'rs, AFL-CIO, Local No. 670 v. Kerr-McGee Refining Corp.*, 618 F.2d 657, 659 (10th

Cir. 1980) (citing *Mistletoe Exp. Serv. V. Motor Expressmen's Union*, 566 F.2d 692 (10th Cir. 1977) ("[A]n award cannot be upheld if it is contrary to the express language of the contract."); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997) ("We will overturn an award where the arbitrator merely mak[es] the right noises-noises of contract interpretation-while ignoring the clear meaning of contract terms. We apply a notion of 'manifest disregard' to the terms of the agreement analogous to that employed in the context of manifest disregard of the law." (internal citation and quotation omitted)). In this case, however, the Arbitrator did not act in manifest disregard of the Contract. Rather, he looked at the Section 4.1 in its entirety and in conjunction with the rest of the Contract and determined that it was ambiguous. The Arbitrator then looked to extrinsic evidence to determine the parties' intent with respect to the rate of pay. As discussed *supra*, in making these decisions, the Arbitrator followed the laws of contract interpretation under Colorado law. Furthermore, I conclude that it is reasonable to interpret the Contract as being ambiguous—although Section 4.1 states that the rate of pay is $25.20 per circuit satisfactorily completed, it also references, in the same section, that the rate is based on a $45 per hour rate. Therefore, I conclude that the Arbitrator did not act in manifest disregard of the Contract and vacatur is not warranted.

3.  <u>Evident Partiality or Corruption on the Part of the Arbitrator</u>

DMA also asserts that the Award must be vacated because there was evidence of partiality or corruption on the part of the Arbitrator. DMA essentially argues that (1) the Arbitrator must have been partial or corrupt because he ruled in favor of Qwest and

(2) all arbitrators are partial towards large corporations due to the nature of the selection process. In effect, DMA proposes vacatur is appropriate whenever a party loses or the opposing party is a large corporation. Either scenario is unreasonable. As DMA has presented no specific evidence of partiality or corruption on the part of the Arbitrator, this claim must fail. *See Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982) ("For an award to be set aside, the evidence of bias or interest of an arbitrator must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative." (citing *Tamari v. Bache Halsey Stuart, Inc.*, 619 F.2d 1196 (7th Cir. 1980))).

4. <u>Public Policy</u>

DMA next argues that the Award must be vacated as a violation of public policy because it does not give effect to the parties' written contract. This argument rests on the false premise that the Arbitrator's conclusion that the rate of pay was $45 per hour was in conflict with the parties' written intent. In fact, and as I have already concluded, this interpretation of the ambiguous Contract was not in manifest disregard of the Contract. Therefore, applying a $45 per hour rate does not clearly violate public policy by ignoring the parties' written contract. *See United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 43 (1987) ("[A] court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (internal quotation marks omitted) (quoting *W.R. Grace &*

*Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983))).

5. <u>Arbitrator Exceeded his Powers</u>

Similarly, DMA argues that the Arbitrator exceeded his powers because his decision supposedly disregarded the PSA's requirement that the arbitrator follow the plain meaning of the Contract.[8]  As previously discussed, such an assumption is incorrect as the Arbitrator determined that the Contract was ambiguous.  Therefore, vacatur is not appropriate.

6. <u>Invoice T-0009</u>

Finally, DMA argues that the Arbitrator did not address its claim that Qwest is required to pay Invoice T-0009 because Qwest did not dispute the invoice within forty-five days of receiving the invoice.  Therefore, DMA argues for vacatur of the Award or an Order requiring Qwest to pay Invoice T-0009.

"[A]n arbitration award is flawed if the arbitrator fails to resolve a matter that the parties submitted pursuant to their agreement." *Youngs v. Am. Nutrition, Inc.*, __ F.3d __, 2008 WL 3126145, at *9 n.7 (10th Cir. Aug. 7, 2008).  In this case, however, although the Arbitrator did not expressly address Invoice T-0009, he did determine that "DMA has been paid in full at the contract rate" and "there is virtually no question that DMA was to be paid, and was paid in full, on a per-consultant hour basis." (Award at 3, 5.)  Such a determination implicitly includes the determination that DMA is not entitled to

---

[8] I note that DMA is not arguing that the Arbitrator lacked the authority to decide the issue of what rate of pay the parties intended.

payment for Invoice T-009. Furthermore, as discussed above, I note that the PSA does not require Qwest to dispute the invoice within forty-five days. *See supra* note 5. Therefore, I conclude that vacatur is not warranted based on this argument.

Accordingly, it is ordered:

1. DMA's Motion to Vacate (Docket No. 1) is denied;

2. Qwest's Motion to Confirm (Docket No. 13) is granted; and

3. The JAMS Arbitration No. 8149, dated November 21, 2007, finding in Qwest's favor on both DMA's contract and tort claims is confirmed and judgment shall enter accordingly pursuant to 9 U.S.C. § 9.


DATED at Denver, Colorado, on September 12, 2008.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge